UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL MILLER, *et al.*,

                              Plaintiffs,

              v.

ANTHONY ANNUCCI, *et al.*,

                              Defendants.

No. 17-CV-4698 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Daniel Miller
Malone, NY
*Pro Se Plaintiff*

Jessica Michelle Acosta-Pettyjohn, Esq.
Julinda A. Dawkins, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiffs Daniel Miller ("Plaintiff") and Mary Miller bring this Action, pursuant to 42

U.S.C. § 1983, against Anthony Annucci ("Annucci"), Jason Effman ("Effman"), Thomas

Griffin ("Griffin"), Jaifa Collado ("Collado"), Sergeant Funk ("Funk"), Sergeant Howard

("Howard"), C.O. Evangeline Nunez ("Nunez"), Robert Bentavegna ("Bentavegna"), Sergeant

Brock ("Brock"), C.O. Pollens ("Pollens"), Steven Maher ("Maher"), Sergeant Johanneman

("Johanneman"), Eric Gutwein ("Gutwein"), Martha Ball ("Ball"), Tanya Rookwood

("Rookwood"; together with Annucci, Effman, Griffin, Collado, Funk, Howard, Nunez,

Bonnacci, Bentavegna, Brock, Pollens, Maher, Johanneman, Gutwein, and Ball, "Defendants"),

Lieutenant Hann ("Hann"), C.O. Griffiths ("Griffiths"), and Sergeant Anspach ("Anspach";

together with Hann and Griffiths, "Unserved Defendants").  (Second Am. Compl. ("SAC") (Dkt.

No. 166).)[1]  Plaintiff alleges that Defendants violated his constitutional rights while he was incarcerated at Green Haven Correctional Facility ("Green Haven").  (*Id.*)  Before the Court is Defendants' Motion for Summary Judgment (the "Motion").  (Not. of Mot. (Dkt. No. 328).)  For the reasons that follow, Defendants' Motion is granted in part and denied in part.

## I.  Background

This Court's 2019 Opinion granted in part and denied in part Defendants' Motion To Dismiss, (*see* 2019 Op. 31), and ordered the Parties to conduct limited discovery regarding whether Plaintiff had satisfied the PLRA requirement to exhaust his administrative remedies, (*see id.* at 26, 32).  After a period of limited discovery, the Court on July 16, 2020 adopted a briefing schedule for Defendants' Motion for Summary Judgment on exhaustion grounds.  (Dkt. No. 321.)  Defendants filed their Motion on August 30, 2020.  (Not. of Mot.; Defs.' Rule 56.1 Statement in Supp. of Mot. ("Defs.' SMF") (Dkt. No. 329); Rule 56.2 Statement (Dkt. No. 330); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 331); Decl. of Julinda Dawkins ("Dawkins Decl.") (Dkt. No. 332).)  On September 30, 2020, Plaintiff filed his response, dated September 25, 2020, to Defendants' Rule 56.1 Statement.  (Pl.'s Aff. in Opp'n to Defs.' SMF ("Pl.'s SMF") (Dkt. No. 333).)  On October 16, 2020, Plaintiff filed a supplement, dated October 2, 2020, to his response to Defendants' Rule 56.1 Statement, (Suppl. Aff. in Opp'n to Defs.' SMF ("Pl.'s Suppl. SMF") (Dkt. No. 341)), and his Opposition, dated October 8, 2020, (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. ("Pl.'s Mem.") (Dkt. No. 342)).  Defendants submitted

---

[1] The Clerk of the Court is respectfully directed to correct the spelling of Gutwein's name as it appears on the docket, (*see* SAC), to terminate Donald Mitchell as a Party pursuant to the Court's September 26, 2019 Opinion & Order (the "2019 Opinion"), (*see* Op. & Order ("2019 Op.") 4, 16–20 (Dkt. No. 275) (alleging that Mitchell punched Plaintiff at Franklin Correctional Facility ("Franklin"), and transferring claims related to Plaintiff's detention at Franklin to the Northern District of New York)), and to terminate Joseph Bonnacci as a Party because Plaintiff has withdrawn his claims against him, (*see* Dkt. No. 230 at 46; Dkt. No. 231 ¶¶ 29, 45).

their Reply on November 6, 2020.  (Reply Mem. of Law in Further Supp. of Mot. ("Defs.'
Reply") (Dkt. No. 346); Decl. of David Mazzella ("Mazzella Decl.") (Dkt. No. 347).)  On
November 18, 2020, Plaintiff submitted a Sur-Reply Declaration, dated November 12, 2020.
(Decl. ("Miller Decl.") (Dkt. No. 348).)  On May 5, 2021, Plaintiff filed a letter, dated April 27,
2021, requesting leave to file supplemental witness affidavits.  (Dkt. No. 353.)  The Court
granted Plaintiff's request, (Dkt. No. 354), and Plaintiff on May 28, 2021 filed the supplemental
affidavits, which were dated May 13 through May 20, 2021, (Aff. ("Miller Aff.") (Dkt.
No. 355)).  Defendants filed their Sur-Reply on June 11, 2021.  (Reply Mem. of Law in Further
Supp. of Defs.' Mot. ("Defs.' Sur-Reply") (Dkt. No. 356).)

The Motion concerns only Defendants' affirmative defense that Plaintiff failed to exhaust
his administrative remedies under the Prison Litigation Reform Act ("PLRA").  (*See* Not. of
Mot.)  As a result, in lieu of a narrative account of Plaintiff's allegations of misconduct at Green
Haven—which was provided in the 2019 Opinion, (*see* 2019 Op. 6–9)—the Court provides a list
of Plaintiff's claims:

1.      A due process claim against Howard for ineffectively assisting Plaintiff in
investigating a misconduct report (the "Howard Claim").  (SAC ¶¶ 144–49.)

2.      A due process claim against Gutwein for delaying a disposition of Plaintiff's
disciplinary proceeding (the "Gutwein Claim").  (*Id.* ¶¶ 150–61, 171–76.)

3.      A due process and Eighth Amendment claim against Griffin, Collado,
Bentavegna, Pollen, Nunez, Funk, Johanneman, and Brock for the conditions of Plaintiff's
confinement pending disposition of his misconduct hearing, including lack of recreation, lack of
a wheelchair, no hygiene products, and no contact with his mother (the "Conditions Claim").
(*Id.* ¶¶ 161–69, 177–85, 187–89, 192–96.)

4.       A due process and Eighth Amendment claim against Pollen, Nunez, Funk, Johanneman, and Brock for refusing to allow Plaintiff out of segregated housing for three days after misconduct charges against him were dismissed (the "Delay Claim).  (*Id.* ¶ 170.)

5.       A claim of verbal abuse against Nunez and Pollen for calling Plaintiff "rapo," "homo," and "fag" (the "Nunez/Pollen Verbal Abuse Claim").  (*Id.* ¶ 186.)

6.       A claim of verbal abuse against Funk, Johanneman, and Brock for calling Plaintiff "homo," "rapo," "mook," "fag," "queer," "pedophile," and "chump" (the "Funk/Johanneman/Brock Verbal Abuse Claim").  (*Id.* ¶ 191.)

7.       A failure to intervene, Equal Protection, and retaliation claim against Funk, Johanneman, and Brock for failing to correct mistreatment by Nunez and Pollen due to Plaintiff's sexual orientation, sex offense conviction, and history of writing complaints and grievances (the "Discrimination Claim").  (*Id.* ¶ 190.)

8.       A due process and Eighth Amendment claim against Pollen for falsely telling Plaintiff that his mother was dead (the "Family Status Claim").  (*Id.* ¶ 194.)

9.       A due process claim against Nunez, Pollen, Funk, and Bentavegna for interfering with Plaintiff's legal telephone call (the "Legal Call Claim").  (*Id.* ¶¶ 198–200.)

10.       A claim of deliberate indifference to medical needs against Bentavegna for failing to issue a facility permit for a wheelchair cushion and egg crate for Plaintiff's mattress (the "Cushion Claim").  (*Id.* ¶¶ 220–21.)

11.       A claim of deliberate indifference to medical needs and retaliation against Bentavegna for refusing to issue Plaintiff a Bi-Pap (breathing) machine to treat his sleep apnea (the "Bi-Pap Claim").  (*Id.* ¶¶ 222–23.)

12.     A claim of deliberate indifference to medical needs and retaliation against Bentavegna for refusing to issue Plaintiff a permit for a wheelchair pusher, which prevented him from traveling to the medical unit to receive needed medication (the "Wheelchair Pusher Claim").  (*Id.* ¶¶ 226–30, 234–36.)

13.     A claim of deliberate indifference to medical needs against Bentavegna for refusing to modify the schedule for administering Plaintiff's medicine to comply with his prescription (the "Medication Claim").  (*Id.* ¶¶ 231–33.)

14.     An excessive force claim against Bentavegna for striking Plaintiff in the face with a one-inch thick folder containing papers (the "Bentavegna Force Claim").  (*Id.* ¶ 237.)

15.     An excessive force claim against Rookwood for striking Plaintiff in the face with a baton (the "Rookwood Force Claim").  (*Id.* ¶ 238.)

16.     A failure to protect claim against Rookwood for three times soliciting different inmates to stab or cut Plaintiff (the "Rookwood Assault Claim").  (*Id.* ¶¶ 239–41, 254.)

17.     A failure to protect, Equal Protection, and retaliation claim against Nunez and Pollen for attempting to have two inmates assault Plaintiff because he is a member of the LGBT community, a sex offender, and had submitted grievances (the "Nunez/Pollen Assault Claim"). (*Id.* ¶¶ 250–51.)

18.     A failure to protect claim against Griffiths, Anspach, Johanneman, and Hann for attempting to have several inmates assault Plaintiff (the "Griffiths/Anspach/Johanneman/Hann Assault Claim").  (*Id.* ¶ 254.)

19.     A retaliation claim against Anspach for authoring a false misbehavior report based on Plaintiff's report of Rookwood's use of excessive force (the "Anspach False Report Claim").  (*Id.* ¶ 242.)

20.     A retaliation claim against Rookwood and Hann for submitting a false misbehavior report alleging that Plaintiff refused a direct order and slept during the count (the "Rookwood/Hann False Report Claim").  (*Id.* ¶¶ 243–44.)

21.     A due process and Eighth Amendment claim against Rookwood and Griffiths for keeplocking Plaintiff on 22 separate days without disciplinary reports (the "Keeplock Claim"). (*Id.* ¶ 245.)

22.     A due process and Eighth Amendment claim against Rookwood for posting Plaintiff's confidential information on a bulletin board in the C-4 housing unit (the "Confidential Information Claim").  (*Id.* ¶¶ 247–48.)

23.     A mail tampering claim against Pollen and Nunez based on their removing from sealed envelopes and discarding grievances addressed to the Inmate Grievance Resolution Committee ("IGRC") (the "Mail Tampering Claim").  (*Id.* ¶¶ 252, 256.)

24.     A claim of supervisory liability against Annucci for maintaining an unofficial custom or policy of permitting abuse and harassment of inmates who are LGBT, are sex offenders, or submit grievances (the "Annucci Claim").  (*Id.* ¶¶ 41, 71–77, 262–65.)

25.     A claim of supervisory liability against Effman, Maher, and Griffin for failing to act on Plaintiff's reports of sexual harassment by staff at Greene Correctional Facility ("GCF") and Rookwood's public posting of Plaintiff's confidential information (the "Supervisory Claim").  (*Id.* ¶¶ 204, 248.)

26.     A due process claim against Ball for failing to investigate Plaintiff's claims of sexual harassment (the "Ball Claim").  (*Id.* ¶¶ 205–06.)

In considering the Motion, the Court divides Plaintiff's claims into five categories: (1) claims against the Unserved Defendants ("Unserved Claims"); (2) claims on which

Defendants do not move ("No Motion Claims"); (3) claims where Defendants present evidence that Plaintiff failed to appeal a grievance, but Plaintiff submits evidence that he did ("Grievance Filed Claims"); (4) claims where Defendants present evidence that no grievance was filed, but where Plaintiff presents evidence that he submitted a grievance to a corrections officer ("Grievance Unavailable Claims"); and (5) claims where Defendants present evidence that Plaintiff did not file a grievance, and Plaintiff does not present evidence that he attempted to file a grievance ("No Grievance Claims").

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114,

123 (2d Cir. 2013) (alteration and citation omitted).  Further, "[t]o survive a [summary

judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility

that his allegations were correct; he need[s] to 'come forward with specific facts showing that

there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012)

(emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings,"

*Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks

omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for

summary judgment is properly supported by documents or other evidentiary materials, the party

opposing summary judgment may not merely rest on the allegations or denials of his

pleading . . . .").  And, "[w]hen opposing parties tell two different stories, one of which is

blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

*Scott v. Harris*, 550 U.S. 372, 380 (2007).

    "On a motion for summary judgment, a fact is material if it might affect the outcome of

the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental

Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role

of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried."  *Brod*, 653 F.3d at 164 (quotation marks omitted).  Thus, a court's goal should

be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr

Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323–24 (1986)).  However, a court should consider only evidence that

would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr*., 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)).  Where the evidence presents "a question of 'he said, she said,'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp*., 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court").  And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and citation omitted).  Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co*., 373 F.3d at 244; *see also Jackson v. Fed. Exp*., 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[] made in light of the opposing party's pro se status" (italics omitted)).  "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence[] are insufficient to overcome a motion for summary judgment."  *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Benefit Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, citation, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

B.  Analysis

The Motion seeks summary judgment only on the basis that Plaintiff failed to exhaust his administrative remedies.  (*See* Not. of Mot.; Defs.' Mem.)  Failure to exhaust is an affirmative defense, not a pleading requirement.  *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013).  Accordingly, "[i]nmates are not required to specially plead or demonstrate exhaustion in their complaints."  *Jones*, 549 U.S. at 216.  The

PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citation omitted).  The exhaustion requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 520, 532 (2002), and includes actions for monetary damages even if monetary damages are not available as an administrative remedy, *see Booth v. Churner*, 532 U.S. 731, 741 (2001).  Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out."  *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (citations, quotation marks, and alteration omitted).  Indeed, the PLRA demands "strict compliance with the grievance procedure . . . , or else dismissal must follow inexorably."  *McCoy v. Goord*, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (citations, alteration, and quotation marks omitted).[2]  As the Supreme Court has explained, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings."  *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006).

Despite these strict requirements, the PLRA contains a "textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  "[T]he exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate . . . must exhaust available remedies, but

---

[2] Thus, Plaintiff's statement that he satisfied "the nature, spirit[,] and purpose of administrative exhaustion," (Pl.'s Mem. 5), is beside the point.

need not exhaust unavailable ones." *Id.* (quoting 42 U.S.C. § 1997e(a)). Crucially, "available" grievance procedures are those actually "capable of use to obtain some relief for the action complained of." *Id.* at 1859 (citation and quotation marks omitted). In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* An administrative remedy is unavailable: (1) where "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the procedure is "so opaque that it becomes, practically speaking, incapable of use," such that "no ordinary prisoner can discern or navigate it"; or (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–60. It bears noting, however, that the "three circumstances discussed in *Ross* do not appear to be exhaustive," *Williams*, 829 F.3d at 123 n.2, but rather "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

The New York State Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Program ("IGP") outlines the procedures that apply to grievances filed by inmates in New York State correctional facilities. The IGP provides for a three-step grievance process. (*See* Dawkins Decl. Ex. E ("Stanaway Decl. and Exs. A & B") 9–26 (Dkt. No. 332-5).) *See* 7 N.Y. COMP. CODES R. & REGS. ("N.Y.C.R.R.") § 701 *et seq.*; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c))). Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence. (*See*

Stanaway Decl. and Exs. A & B 15.)  *See* 7 N.Y.C.R.R. § 701.5(a)(1).  Once filed, the representatives of the Inmate Grievance Resolution Committee ("IGRC") have up to 16 calendar days to resolve the grievance informally.  (*See* Stanaway Decl. and Exs. A & B 15.)  *See* 7 N.Y.C.R.R. § 701.5(b)(1).  If the matter is not satisfactorily resolved, the IGRC conducts a hearing to either answer the grievance or make a recommendation to the superintendent, (*see* Stanaway Decl. and Exs. A & B 15); *see* 7 N.Y.C.R.R. § 701.5(b)(2)(i), which is scheduled within 16 days after receipt of the grievance, (*see* Stanaway Decl. and Exs. A & B 16); *see* 7 N.Y.C.R.R. § 701.5(b)(2)(ii).  The second step in the tripartite framework is for the grievant or any direct party to appeal the IGRC's decision to the prison superintendent within seven calendar days after receipt of the IGRC's written response, although the appealing party can seek an exception to the time limit.  (*See* Stanaway Decl. and Exs. A & B 17.)  *See* 7 N.Y.C.R.R. § 701.5(c)(1).  The third and final step is to appeal the superintendent's decision to the Central Office Review Committee ("CORC"), which the prisoner must do within seven days after receipt of the superintendent's written response to the grievance.  (*See* Stanaway Decl. and Exs. A & B 18.)  *See* 7 N.Y.C.R.R. § 701.5(d)(1)(i).  Here, too, an inmate may request an exception to the time limit.  (*See* Stanaway Decl. and Exs. A & B 18.)  *See* 7 N.Y.C.R.R. § 701.5(d)(1)(i).

As discussed, the Court divides Plaintiff's claims into five categories: (1) Unserved Claims, (2) No Motion Claims, (3) Grievance Filed Claims, (4) Grievance Unavailable Claims, and (5) No Grievance Claims.

The Unserved Claims include the Griffiths/Anspach/Johanneman/Hann Assault Claim (#18), insofar as it relates to Griffiths, Anspach, and Hann; the Anspach False Report Claim (#19); the Rookwood/Hann False Report Claim (#20), insofar as it relates to Hann; and the Keeplock Claim (#21), insofar as it relates to Griffiths.  The No Motion Claims include the

Wheelchair Pusher Claim (#12) and the Rookwood Assault Claim (#16), insofar as it relates to

two incidents in 2017.  In both cases, Defendants note explicitly that they do not seek summary

judgment.  (*See* Defs.' Mem. 10.)  They also include claims that Defendants do not raise in their

moving papers: the Howard Claim (#1); the Family Status Claim (#8); the Legal Call Claim (#9);

the Griffiths/Anspach/Johanneman/Hann Assault Claim (#18), insofar as it relates to

Johanneman; the Keeplock Claim (#21), insofar as it relates to Rookwood; and the Supervisory

Claim (#25), insofar as it relates to Griffin.  Because Defendants do not move on the Unserved

Claims and the No Motion Claims, they each survive.

The Grievance Filed Claims include the Gutwein Claim (#2); and the Conditions Claim

(#3), insofar as it relates to lack of recreation, hygiene products, and contact with Plaintiff's

mother (but excluding the claim that Plaintiff was denied a wheelchair).  The Motion is denied as

to the Grievance Filed Claims because Defendants do not adduce undisputed evidence that

Plaintiff failed to exhaust administrative remedies.

The Grievance Unavailable Claims include the Conditions Claim (#3), insofar as it

claims Plaintiff was denied a wheelchair; the Nunez/Pollen Verbal Abuse Claim (#5); the

Funk/Johanneman/Brock Verbal Abuse Claim (#6); the Bentavegna Force Claim (#14); the

Rookwood Assault Claim (#16), insofar as it relates to an incident in 2018; the Nunez/Pollen

Assault Claim (#17); the Confidential Info Claim (#22); and the Mail Tampering Claim (#23).

The Motion is denied as to Grievance Unavailable Claims because Plaintiff has proffered enough

evidence for a reasonable factfinder to determine that the grievance process was unavailable,

satisfying an exception to the PLRA exhaustion requirement.

The No Grievance Claims include the Delay Claim (#4); the Discrimination Claim (#7);

the Cushion Claim (#10), the Bi-Pap Claim (#11); the Medication Claim (#13); the Rookwood

Force Claim (#15); the Rookwood/Hann False Report Claim (#20), insofar as it relates to Rookwood; the Annucci Claim (#24); the Supervisory Claim (#25), insofar as it relates to Effman and Maher; and the Ball Claim (#26).  The Motion is granted as to the No Grievance Claims because Defendants have provided undisputed evidence that Plaintiff failed to exhaust his administrative remedies, and Plaintiff has made no showing that would allow a reasonable factfinder to conclude that administrative remedies were unavailable.

### 1.  Unserved Claims

Defendants accurately note that Griffiths, Anspach, and Hann have not yet been served. (*See* Not. of Mot.; Defs.' Mem. 1.)  Because no counsel has appeared to argue on their behalf, the Court does not consider any portion of Defendants' Motion with respect to the Unserved Defendants.  As discussed, this includes the Griffiths/Anspach/Johanneman/Hann Assault Claim (#18), insofar as it relates to Griffiths, Anspach, and Hann; the Anspach False Report Claim (#19); the Rookwood/Hann False Report Claim (#20), insofar as it relates to Hann; and the Keeplock Claim (#21), insofar as it relates to Griffiths.  Typically, where, as here, a plaintiff proceeds in forma pauperis ("IFP"), he or she is entitled to rely on service by the U.S. Marshals. *See* Fed. R. Civ. P. 4(c)(3); *see also Romandette v. Weetabix Co., Inc*., 807 F.2d 309, 311 (2d Cir. 1986).  Although Rule 4(m) specifies that defendants not served within 90 days of the filing of a complaint should be dismissed, district courts "have discretion to grant extensions, and may do so even in the absence of good cause." *Meilleur v. Strong*, 682 F.3d 56, 61 (2d Cir. 2012) (citation and quotation marks omitted).  The Second Circuit has stated that "a district court abuses its discretion when, among other things, it dismisses a complaint sua sponte for lack of service without first giving notice to the plaintiff and providing an opportunity for her to show good cause for the failure to effect timely service." *Id*. (italics omitted).  However, "[p]laintiffs

are not excused from complying with the applicable rules of service merely by virtue of their pro se status." *Cassano v. Altshuler*, 186 F. Supp. 3d 318, 321 (S.D.N.Y. 2016) (italics omitted) (dismissing case where pro se plaintiffs failed to effect service on defendants and failed to request an extension of time to serve).

Accordingly, the Court provides notice that Plaintiff must within 30 days request an extension of time to serve Griffiths, Anspach, and Hann, or his claims against these Unserved Defendants may be dismissed.

### 2.  No Motion Claims

Defendants admit that Plaintiff exhausted his administrative remedies for the Wheelchair Pusher Claim (#12) and the Rookwood Assault Claim (#16), insofar as it relates to two alleged incidents in 2017.  (Defs.' Mem. 10.)  In addition, Defendants do not advance undisputed material facts that would allow the Court to conclude that Plaintiff failed to administratively exhaust the Howard Claim (#1); the Family Status Claim (#8), the Legal Call Claim (#9), the Griffiths/Anspach/Johanneman/Hann Assault Claim (#18), with respect to Johanneman; the Keeplock Claim (#21), with respect to Rookwood; and the Supervisory Claim (#25), with respect to Griffin.  (*See generally* Defs.' SMF.)  Defendants do argue that they have identified the "only properly pled claims that Plaintiff properly exhausted prior to asserting them."  (Defs.' Mem. 10.)  And Defendants also contend that it is undisputed that Plaintiff filed 25 grievances and 12 grievance appeals to CORC from May 18, 2017 to May 2018.  (*See* Defs.' SMF ¶¶ 18–19.) However, Defendants' Rule 56.1 Statement refers specifically to only six grievances.  (*See id*. ¶¶ 20–27.)  This leaves nineteen grievances unaccounted for.  (*See id.* ¶¶ 18–27.)  Thus, Defendants' Rule 56.1. Statement does not assert facts establishing the absence of grievances regarding these claims.  Because Defendants failed to include facts regarding these claims in

their Rule 56.1 Statement, (*see generally id.*), Plaintiff "was not given an opportunity to cite

counter-evidence for these allegations," *Kayo v. Mertz*, —F. Supp. 3d—, 2021 WL 1226869, at

*1 n.2 (S.D.N.Y. Mar. 31, 2021), and the Court declines to scour the record for evidence to

extend Defendants' argument past its Rule 56.1 submission.[3]  Thus, each of these claims

survives.[4]

### 3.  Grievance Filed Claims

Defendants acknowledge that Plaintiff filed a grievance regarding the Gutwein Claim

(#2) and the Conditions Claim (#3), with respect to a lack of recreation, no hygiene products, and

no contact with Plaintiff's mother.  (Defs.' SMF ¶ 20; Stanaway Decl. Exs. C & D 2–3.)[5]

---

[3] Even if the Court were to consider Defendants' declarations as annexed into their Rule 56.1 Statement, the Court could not conclude that Defendants are entitled to summary judgment on these claims.  Defendants provide a declaration with a chart listing the grievances that were appealed to CORC from May 18, 2017 through May 2018.  (*See* Dawkins Decl. Ex. D ("Seguin Decl.") ¶ 8 (Dkt. No. 332-4).)  But this document provides only a cursory summary of the grievances.  (*See id.*)  And while an accompanying declaration contains the underlying paperwork for most of the listed grievances, it omits two: GH-88355-17 ("Pilot Package Program (Dir. #4911A)") and GH-88657-18 ("Respond To Claim Appeal").  (*See* Dawkins Decl. Ex. E ("Stanaway Decl. Exs. C & D") 2–59 (Dkt. No. 332-6); *see also* Seguin Decl. ¶ 8.)  Thus, on this record, the Court cannot conclude that these two grievances did not include the claims described above, even ignoring Defendants' failure to provide adequate notice that it was moving for summary judgment on these claims.

[4] Regarding the Howard Claim (#1) and the Gutwein Claim (#2), Defendants argue that Plaintiff fails to state a claim because he was acquitted of the disciplinary charge.  (Defs.' Mem. 10–11.)  Regarding the Wheelchair Pusher Claim, Defendants argue that it fails to state a claim because it reflects disagreements in medical judgment, not deliberate indifference.  (*Id.* at 13.)  Defendants argue regarding the Nunez/Pollen (#5) and Funk/Johanneman/Brock (#6) Verbal Abuse Claims that verbal harassment cannot rise to the level of a constitutional violation.  (*Id.* at 15.)  The Court does not consider these arguments, because the ordered briefing schedule was "limited to the issue of exhaustion."  (Dkt. No. 321.)

[5] The Court notes that Plaintiff's grievance did not claim that he was denied a wheelchair while in SHU.  (*See* Stanaway Decl. Exs. C & D 3.)  Thus, the Court subdivides the Conditions Claim, placing Plaintiff's claims with respect to recreation, hygiene products, and contact with his mother in this category, and Plaintiff's claim with respect to the wheelchair in the Grievance Unavailable Claims category.

Defendants move for summary judgment on the basis that Plaintiff did not appeal this grievance to the Superintendent or to CORC.  (Defs.' SMF ¶ 21.)  But Plaintiff has adduced evidence that he appealed both to the Superintendent, (Pl.'s SMF ¶ 46; *id.* Ex. 1 at 40 (Dkt. No. 333-1)), and to CORC, (Pl.'s SMF ¶¶ 76, 78–79; *id.* Ex. 1 at 62).[6]  Thus, Plaintiff adequately disputes that he did not appeal to the Superintendent and CORC, and Defendants' Motion is denied with respect to these claims.  *See Braxton v. Bruen*, No. 17-CV-1346, 2020 WL 5752333, at *7 (N.D.N.Y. Aug. 24, 2020) (denying a motion for summary judgment where the plaintiff "proffered copies of his . . . appeals" and gathering cases), *report and recommendation adopted*, 2020 WL 5751172 (N.D.N.Y. Sept. 25, 2020); *Logan v. Graham*, No. 18-CV-291, 2019 WL 8015209, at *11 (N.D.N.Y. Nov. 26, 2019) (finding that the plaintiff's allegation that he appealed on a specific date, even absent a copy of that appeal, sufficed to establish a factual dispute at summary judgment, in part because "[the] [d]efendants bear the ultimate burden of proving that [the] [p]laintiff did not exhaust his administrative remedies"), *report and recommendation adopted*, 2020 WL 871197 (N.D.N.Y. Feb. 21, 2020).[7]

---

[6] Defendant makes no factual showing or argument regarding the timeliness of Plaintiff's appeal to the Superintendent, dated July 27, 2017, (Pl.'s SMF Ex. 1 at 40), after his grievance was indicated as returned by the IGRC on July 18, 2017, (Stanaway Decl. Exs. C & D 4).  Thus, the Court does not consider this argument.  (*See* Dawkins Decl. Ex. E ("Stanaway Decl. and Exs. A & B") 17 (Dkt. No. 332-5) (indicating that an inmate must appeal "within seven calendar days after receipt of the IGRC's decision to dismiss the grievance").)  *See also* 7 N.Y.C.R.R. § 701.5(c)(1) (same).

[7] Because Defendants make no factual showing or offer legal argument, the Court takes no position on whether Plaintiff was required to or did receive a response from CORC before filing suit, s*ee Ulmer v. Bedore*, No. 15-CV-497, 2018 WL 7291499, at *7 (N.D.N.Y. Nov. 13, 2018) ("Courts in this Circuit have been split as to whether a delay by CORC in responding to an appeal constitutes unavailability that would excuse a plaintiff's failure to exhaust."), *report and recommendation adopted sub nom. Ulmer v. Dibble*, 2019 WL 587909 (N.D.N.Y. Feb. 13, 2019), or on whether Plaintiff was required to contact the IGP supervisor to confirm that his appeal to CORC was filed, *see Gibbs v. Gadway*, No. 19-CV-281, 2019 WL 5191506, at *4 (N.D.N.Y. Oct. 15, 2019), *report and recommendation adopted*, 2020 WL 1227156 (N.D.N.Y.

Defendants may apply to the Court for an evidentiary hearing on whether Plaintiff exhausted his administrative remedies with respect to the Grievance Filed Claims. *See Ortiz v. Annucci*, No. 17-CV-3620, 2019 WL 1438006, at *9 (S.D.N.Y. Mar. 29, 2019) (scheduling an evidentiary hearing to determine whether the plaintiff satisfied the exhaustion requirement).

### 4.  Grievance Unavailable Claims

As discussed, Plaintiff need not exhaust administrative remedies where such remedies are unavailable. *See Ross*, 136 S. Ct. at 1858.  In *Williams*, the Second Circuit identified a scenario where the grievance procedure was unavailable because it was so opaque as to be incapable of use.  829 F.3d 118.  This scenario had three notable characteristics.[8]  First, the plaintiff was housed in a special housing unit ("SHU") and, thus, made to rely on a correction officer to submit grievances.  *Id.* at 120.  Second, the plaintiff did, in fact, rely on a correction officer to submit a grievance.  The plaintiff drafted a grievance, and "gave the grievance to a correction officer to forward to the grievance office on his behalf." *Id*. at 120–21.  A week later, the plaintiff told another correction officer that he had yet to receive a response, and that correction officer said she would look into it.  *Id*. at 121.  Third, the grievance was never submitted.  The plaintiff did not receive a response, and he alleged that the correction officer to whom he provided his grievance never filed it.  *Id*.  The Second Circuit concluded that the grievance "regulations simply [did] not contemplate" this situation, "making it practically impossible for [the plaintiff] to ascertain whether and how he could pursue his grievance."  *Id*. at 124.  This is because "the regulations only contemplate appeals of grievances that were actually filed."  *Id*.

---

Mar. 13, 2020) (holding that a plaintiff's failure to adhere to this "specific guidance . . . on how to proceed . . . cannot provide the basis for excusing him from the exhaustion requirement").

[8] The Court takes no position on whether all three characteristics are required to support a finding that administrative remedies are unavailable.

19

A reasonable factfinder could conclude that Plaintiff faced materially identical circumstances for each of the Grievance Unavailable Claims.  First, Plaintiff says via affidavit that he was in SHU for the entire time period in question.  From the time when Plaintiff was first brought to Green Haven to the time when the disciplinary charges against him were dismissed, he was housed in an isolation room in the infirmary.  (Pl.'s SMF ¶ 26.)  The infirmary did not have a box for submitting grievances.  (*Id*. ¶ 16; *see also* Pl.'s SMF Ex. 1 at 10 (indicating no such box in the infirmary).)[9]  As a result, Plaintiff was required to send mail such as grievances by "placing [it] under the interior door" into a decontamination chamber outside his room.  (Pl.'s SMF ¶ 29; *see also* Pl.'s SMF Ex. 1 at 17 (containing a diagram of Plaintiff's room).)  On July 7, 2017, Plaintiff was moved to a general housing room in the infirmary.  (Pl.'s SMF ¶ 61.)  Again, because there was no box for submitting grievances in the infirmary, Plaintiff was required to leave grievances on the inside ledge of a window to his room.  (*Id*. ¶ 62; *see also* Pl.'s SMF Ex. 1 at 44 (containing a diagram of the general population room).)  Plaintiff relied on correction officers to take the mail during rounds.  (Pl.'s SMF ¶ 62.)  On July 24, 2017, Plaintiff was moved to C-Block.  (*Id*. ¶ 69.)  Because Plaintiff ate meals in the C-Block gallery and not in the Mess Hall with general population inmates, he lacked access to the mailbox and box for grievances. (*Id*. ¶ 71.)  Instead, Plaintiff was required to place his mail and grievances in a small bin in the gallery.  (*Id*. ¶ 70.)  A reasonable factfinder could find based on this testimony that each of Plaintiff's rooms was a special housing unit, forcing Plaintiff to rely on correction officers to submit grievances.

---

[9] Because of occasionally illegible native pagination, the Court refers to the ECF system-generated page number in the top right-hand corner of the page in referring to the exhibits appended to Plaintiff's Statement of Material Facts.

Second, a reasonable factfinder could find that Plaintiff, relying on correction officers, actually did attempt to submit grievances regarding these claims.  Plaintiff's affidavit states that he filed grievances regarding each of the Grievance Unavailable Claims.  (*See* Pl.'s SMF ¶¶ 55 (indicating that Plaintiff filed a grievance regarding the wheelchair component of the Conditions Claim (#3)), 60 (indicating that Defendants' claims about the Nunez/Pollen Verbal Abuse Claim (#5), the Funk/Johanneman/Brock Verbal Abuse Claim (#6), the Bentavegna Force Claim (#14), the Nunez/Pollen Assault Claim (#17), and Mail Tampering Claim (#23) are false), 76 (indicating that Plaintiff filed a grievance regarding the Bentavegna Force Claim (#14)), 92 (contesting Defendants' claim that Plaintiff filed no grievance regarding the Confidential Information Claim (#22)), 94 (indicating that Plaintiff filed a grievance regarding the Rookwood Assault Claim (#16), insofar as it relates to an alleged incident in 2018).)  This Court has previously held that "[the] [p]laintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact." *Davis v. Grant*, No. 15-CV-5359, 2019 WL 498277, at *9 (S.D.N.Y. Feb. 8, 2019) (quoting *Engles v. Jones*, No. 13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018)). However, this case is distinguishable because Plaintiff was "housed in SHU [and] was dependent on the officers to file a grievance for him."  *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *10 (S.D.N.Y. Sept. 28, 2018).  As a result, the Court could on this basis alone follow several courts that have "denied summary judgment based on sworn . . . testimony from the [p]laintiff creating a dispute of material fact regarding whether a [p]laintiff's grievance was submitted."  *Id.* (collecting cases); *see also Trahan v. Capozzola*, No. 12-CV-4353, 2017 WL 9512406, at *5 (E.D.N.Y. June 26, 2017) ("[The] [p]laintiffs' position is supported by his sworn testimony, which is sufficient to defeat summary judgment."), *report and recommendation adopted*, 2017

WL 4286620 (E.D.N.Y. Sept. 27, 2017); *Reid v. Marzano*, No. 15-CV-761, 2017 WL 1040420, at *3 (N.D.N.Y. Mar. 17, 2017) (concluding, where the plaintiff, "while in the SHU . . . , gave his grievance to a correction officer to be filed," that the plaintiff's testimony was "sufficient to withstand [the] [d]efendants' motion for summary judgment").

This is unnecessary, however, because Plaintiff in each case supports his "bare assertions," *Rodriguez v. Cross*, No. 15-CV-1079, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017), *report and recommendation adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017), with documents that corroborate his claim that he filed the referenced grievances.  For the Conditions Claim (#3), with respect to the denial of a wheelchair; the Rookwood Assault Claim (#16), with respect to the alleged incident in 2018; and the Confidential Info Claim (#22), Plaintiff provides a copy of the grievance he attempted to submit.  (*See* Pl.'s SMF Ex. 1 at 22–23 (containing a grievance regarding the failure to provide a wheelchair), 74–80 (containing a grievance regarding Rookwood's alleged posting of confidential information, as well as several putative appeals indicating a lack of response), 82–88 (containing a grievance regarding Rookwood's alleged efforts to induce another inmate to cut or stab Plaintiff, as well as several putative appeals indicating a lack of response).)  For the Mail Tampering Claim (#23) and the Bentavegna Force Claim (#14), Plaintiff provides documents such as letters or putative appeals that refer specifically to the outstanding grievance.  (*Id*. at 40 (noting a putative appeal of a grievance against Pollen and Nunez for mail tampering), 48 (noting a grievance against Pollen and Nunez for mail tampering), 62 (containing a putative appeal of a mail grievance), 67 (containing a putative appeal of a grievance—to which Plaintiff had received no response—regarding Bentavegna striking Plaintiff with a folder).)  For the Nunez/Pollen Verbal Abuse Claim (#5), the Funk/Johanneman/Brock Verbal Abuse Claim (#6), and the Nunez/Pollen Assault Claim (#17),

22

Plaintiff provides correspondence that a reasonable factfinder could conclude corroborates his assertion that he attempted to file grievances.  (*See id.* at 40 (affecting a putative appeal of grievances against Funk and Brock for "sexual harassment" and against Nunez and Pollen for "harassment" and "retaliation"), 62 (indicating unanswered grievances about Funk, Brock, Nunez, and Pollen), 63 (indicating an unanswered grievance about Johanneman), 67 (indicating an unanswered grievance against Nunez and Pollen for "[h]arassment").)  The Court concludes that these corroborating documents—combined with Plaintiff's testimony, as discussed—suffice to establish a dispute for a factfinder.  *See Thompson v. Booth*, No. 16-CV-3477, 2021 WL 918708, at *8–9 (S.D.N.Y. Mar. 10, 2021) (denying a motion for summary judgment where "the [p]laintiff annexed to his [d]eclaration what he represent[ed] to be copies of . . . two grievances"); *Braxton*, 2020 WL 5752333, at *7 (denying a motion for summary judgment where the plaintiff "proffered copies of his grievances, appeals, and letters" and gathering cases); *Ortiz*, 2019 WL 1438006, at *8–9 (denying a motion for summary judgment where the plaintiff submitted "a copy of the alleged grievance").[10]

Third, a reasonable factfinder could conclude that the grievances regarding the Grievance Unavailable Claims were not filed.  Indeed, Defendants claim that it is undisputed that no such grievances were filed.  (*See* Defs.' SMF ¶¶ 31 (Conditions Claim (#3), regarding failure to issue a wheelchair), 34 (Bentavegna Force Claim (#14)), 35 (Nunez/Pollen (#5) and Funk/Johanneman/Brock (#6) Verbal Abuse Claims), 38 (Rookwood Assault Claim (#16), with respect to an incident in 2018), 39 (Confidential Information Claim (#22)), 41 (Nunez/Pollen

---

[10] While the Court accepts Plaintiff's position that he attempted to submit grievances that were not filed, it does not rely on cases cited by Plaintiff referring to the prison mailbox rule. (*See* Pl.'s Mem. 8–9.)  These cases are inapposite because they relate only to assessing the timeliness of prisoner grievances or appeals, which is not at issue here.  *See Houston v. Lack*, 487 U.S. 266, 276 (1988); *Grant v. Senkowski*, 744 N.E.2d 132, 133–34 (N.Y. 2001).

Assault Claim (#17)), 42 (Mail Tampering Claim (#23)).)  These facts are consistent with

applying *Williams* to find that administrative remedies were unavailable.  *See Ortiz*, 2019 WL

1438006, at *9 ("[T]he evidence set forth by Defendants that Plaintiff failed to exhaust his

administrative remedies is . . . consistent with Plaintiff's claim that his grievance was destroyed

or otherwise obstructed by corrections officers.").

      Defendants' counterarguments fail.  For example, it is irrelevant for purposes of these

claims that Plaintiff was familiar with the grievance process and has successfully filed other

grievances.  (*See* Defs.' Reply 9–10; Defs.' Sur-Reply 2–3.)  "[I]n light of the Second Circuit's

finding that the IGP regulations 'simply do not contemplate the situation' in which a SHU

inmate's grievance is never 'actually filed,' Plaintiff's familiarity with the standard IGP

regulations could hardly make his situation less 'opaque' or render administrative remedies more

available."  *Ortiz*, 2019 WL 1438006, at *9 (emphasis omitted) (quoting *Williams*, 829 F.3d at

124).  The same is true of Plaintiff's successful filing of some grievances while in the infirmary.

(*See* Defs.' Reply 9–10 ("Plaintiff's conclusory arguments that DOCCS and CORC

systematically prevent inmates from filing grievances is contradicted by Plaintiff's admission to

filing dozens of submissions in various unrelated matters while he was in the infirmary.").)  That

Plaintiff may have been "keenly aware of the grievance process," *Veloz v. New York*, 339

F. Supp. 2d 505, 516 (S.D.N.Y. 2004), *aff'd*, 178 F. App'x 39 (2d Cir. 2006), does not establish

that he understood IGRP regulations that the Second Circuit has held make it "practically

impossible" for someone in Plaintiff's position "to ascertain whether and how he could pursue

his grievance," *Williams*, 829 F.3d at 124.

      The Parties dispute whether inmates made rounds to collect inmate grievances from the

infirmary where Plaintiff was housed.  Plaintiff attests that he was made to rely on corrections

officers to collect his grievances.  (*See* Pl.'s SMF ¶¶ 16, 29, 62, 70.)  In response, Defendants

offer a declaration regarding an inmate who works for IGRC and visits the areas where Plaintiff

was housed once a week to check for grievances.  (Mazzella Decl. ¶¶ 8–10.)  Plaintiff offers

affidavits from four inmates, which state that no grievance clerk makes rounds in the prison

infirmary, (Miller Aff. 23, 25, 28, 31, 36), and that inmates must leave grievances and other mail

for correction officers to submit, (*id*. at 22–23, 28, 32, 35).  This conflicting testimony

establishes a factual dispute regarding whether an IGRC representative made rounds to collect

grievances where Plaintiff was housed.[11]  Thus, the Court does not consider the existence of

IGRC rounds in adjudicating the Motion.[12]

     Defendants may apply for the Court to hold an evidentiary hearing on the issue of

whether administrative remedies were unavailable with respect to the Grievance Unavailable

Claims.  *See Braxton*, 2020 WL 5752333, at *6–8 (denying a similar motion for summary

judgment and recommending an exhaustion hearing); *see also Messa v. Goord*, 652 F.3d 305,

309 (2d Cir. 2011) (holding that a court, and not a jury, may decide "whether an inmate asserts a

valid excuse for non-exhaustion"); *cf. Mojica v. Murphy*, No. 17-CV-324, 2021 WL 1318168, at

---

[11] Because the Court finds a factual dispute regarding whether an inmate who works for IGRC made rounds, it denies without prejudice Plaintiff's request for a subpoena for camera footage that could corroborate his claim.  (*See* Dkt. No. 358.)  Without taking a position on the propriety of Plaintiff's request, the Court notes that such requests should be made through discovery in the first instance.

[12] The Court takes no view regarding whether the presence of IGRC representatives is material under *Williams*, though it notes that at least one court has suggested that it is not.  In *Trahan*, the plaintiff filed a grievance that was rejected as untimely.  2017 WL 9512406, at *2.  The plaintiff alleged that he had handed an earlier, timely grievance to a correction officer, which was not filed with the grievance officer.  *Id*.  Applying *Williams*, and without considering whether the plaintiff could have submitted his grievance through different means, the court found a factual dispute regarding the existence of administrative remedies.  *Id*. at *5.

*10 (N.D.N.Y. Apr. 8, 2021) (finding, after an exhaustion hearing, that the plaintiff's testimony regarding unavailability was not credible).

### 5.  No Grievance Claims

Defendants contend that Plaintiff did not submit a grievance regarding the Delay Claim (#4), (Defs.' SMF ¶ 28), the Cushion Claim (#10), (*id.* ¶ 29), or the Rookwood Force Claim (#15), (*id.* ¶ 37).  Plaintiff admits that he did not submit a grievance for the Delay Claim (#4), (Pl.'s SMF ¶ 49), the Cushion Claim (#10), (*id.*), or the Rookwood Force Claim (#15), (*id.* ¶ 90). Plaintiff consents to the dismissal of the Delay Claim (#4) and Cushion Claim (#10), (*id.* ¶ 49), and states that he had insufficient evidence to file a grievance regarding the Rookwood Force Claim (#15), (*id.* ¶ 90).  Thus, it is undisputed that Plaintiff did not exhaust his administrative remedies with respect to these claims.

Defendants contend that Plaintiff did not submit a grievance regarding the Discrimination Claim (#7).  (Defs.' SMF ¶ 36.)  Plaintiff does not contest that he did not submit a grievance, but argues that it was a "PREA [c]omplaint" and that "with PREA [c]omplaints, a grievance is not necessary."  (Pl.'s SMF ¶ 89.)  Inmate Grievance Program regulations do treat inmate claims of sexual harassment differently from other grievances.  (*See* Stanaway Decl. and Exs. A & B 11.) *See* 7 N.Y.C.R.R. § 701.3(i).  However, the Court agrees with Defendants' position that the Discrimination Claim—which alleges that, after Plaintiff complained of mistreatment, Funk, Johanneman, and Brock "[consistently] denied any relief" on the basis of Plaintiff's "assumed sexual orientation" and other factors, (SAC ¶ 190)—does not allege sexual harassment, and that Plaintiff as a result was required to use the IGP process, (Defs.' Reply 8).

Defendants contend that Plaintiff did not submit a grievance regarding the Rockwood/Hann False Report Claim (#20), with respect to Rookwood.  (Defs.' SMF ¶ 40.)

Plaintiff does not claim that he submitted a grievance.  Instead, he argues that exhaustion was not needed because, until Rookwood's report was invalidated, a § 1983 complaint would have been barred under *Heck v. Humphrey*, 512 U.S. 477 (1994).  (Pl.'s SMF ¶ 95.)  As framed, this argument is not persuasive.  The Court is unaware that the *Heck* doctrine is incorporated into the Inmate Grievance Program, and Plaintiff was bound to comply with local regulations.  *See Jones*, 549 U.S. at 218 (holding that exhaustion requires inmates to "complete the administrative review process in accordance with the applicable procedural rules," and that these rules "are defined not by the PLRA, but by the prison grievance process itself" (citation omitted)).

Thus, consistent with its obligation to construe liberally Plaintiff's pro se submissions, *Triestman*, 470 F.3d at 474, the Court construes Plaintiff to be arguing that his claim of a false report was non-grievable under the Inmate Grievance Program, and, therefore, no administrative remedies were available.  At least one court has accepted this argument.  *See Agee v. Cuomo*, No. 19-CV-57, 2020 WL 7688051, at *5 (N.D.N.Y. Oct. 22, 2020), *report and recommendation adopted sub nom.*, *Agee v. Mitchell*, 2020 WL 7041011 (N.D.N.Y. Dec. 1, 2020).  This court pointed to two components of the Inmate Grievance Program.  *Id*.  First, it provides that "an individual decision or disposition resulting from a disciplinary proceeding . . . is not grievable." (Stanaway Decl. and Exs. A & B 10.)  *See* 7 N.Y.C.R.R. § 701.3(e)(2).  It also provides that the IGRC can dismiss a grievance if an inmate "is seeking a decision or an appeal of a decision otherwise attainable through the established procedures for . . . disciplinary . . . committee proceedings."  (Stanaway Decl. and Exs. A & B 17.)  *See* 7 N.Y.C.R.R. § 701.5(b)(4)(i)(C)(2). The court in *Agee* held that no grievance procedure was available because the defendant's accusation that an official had planted a weapon on him "would not have even been considered

by the IGRC, given that [the] plaintiff's claims were intimately related with the validity of the

disciplinary action." *Agee*, 2020 WL 7688051, at *5.

     Several courts have disagreed with this position.  These courts have distinguished "the

'result' of the disciplinary hearing"—which is not grievable—from alleged "retaliation in issuing

the misbehavior report" that led to the hearing—which is grievable.  *Toliver v. Adner*, No. 18-

CV-1420, 2019 WL 3503059, at *3 (N.D.N.Y. June 3, 2019), *report and recommendation*

*adopted*, 2019 WL 3497099 (N.D.N.Y. Aug. 1, 2019), *aff'd*, 836 F. App'x 68 (2d Cir. 2020),

*cert. denied*, No. 20-7384, 2021 WL 1520923 (U.S. Apr. 19, 2021); *see also Allah v. Latona*,

—F. Supp. 3d—, 2021 WL 1969977, at *4 (W.D.N.Y. May 18, 2021) (finding that a plaintiff's

claim of retaliation was "not based on a denial of due process at his disciplinary hearing," but

instead "based on retaliatory conduct he allege[d] he experienced . . . including that he received

false misbehavior reports that resulted in disciplinary hearings"), *appeal docketed*, No. 21-1367

(2d Cir. May 26, 2021); *Allah v. Ryan*, 436 F. Supp. 3d 621, 628 (W.D.N.Y. 2020) ("[I]nmates

are not procedurally barred from grieving matters relating to the conduct of a hearing on

disciplinary charges, or to the factual matters giving rise to the charges. What is not grievable is

the *result* of the hearing.").  The Court agrees with the majority of the courts that have

considered the issue.  The Rockwood/Hann False Report Claim (#20) is grievable because

Plaintiff does not challenge "an individual decision or disposition *resulting from* a disciplinary

proceeding," (Stanaway Decl. and Exs. A & B 10 (emphasis added)); *see* 7 N.Y.C.R.R.

§ 701.3(e)(2) (emphasis added), but a false report *leading to* a disciplinary proceeding.

Similarly, a grievance on this issue would not seek "a decision or an appeal of a decision

otherwise attainable through" the disciplinary process, (Stanaway Decl. and Exs. A & B 17); *see*

7 N.Y.C.R.R. § 701.5(b)(4)(i)(C)(2), because the disciplinary process evaluates the charge

against Plaintiff, not Plaintiff's accusation of Rookwood and Hann.

Defendants contend that Plaintiff did not submit a grievance regarding the Annucci Claim

(#24), (Defs.' SMF ¶ 44); the Supervisory Claim (#25), with respect to Effman and Maher, (*id*.

¶¶ 43, 44); or the Ball Claim (#26), (*id*. ¶ 43).  Plaintiff does not contest this point.  Instead,

Plaintiff argues that this does not matter because these Defendants "have been sued for their

personal involvement based on an unwritten 'policy or custom' theory."  (Pl.'s SMF ¶ 96.)  But

incarcerated plaintiffs must exhaust administrative remedies to bring *Monell* claims, *see Saeli v.*

*Chautauqua County*, No. 17-CV-6221, 2020 WL 3547049, at *3 (W.D.N.Y. June 30, 2020),

*appeal docketed,* No. 20-2340 (2d Cir. July 24, 2020); *Edwards by Edwards v. City of New York*,

No. 15-CV-3637, 2019 WL 3456840, at *11 (S.D.N.Y. July 31, 2019), as well as claims of

supervisory liability, *Reeder v. Uhler*, No. 16-CV-1161, 2019 WL 5197560, at *5 (N.D.N.Y.

Sept. 10, 2019), *report and recommendation adopted*, 2019 WL 4686351 (N.D.N.Y. Sept. 26,

2019).

Defendants contend that Plaintiff did not submit a grievance regarding the Bi-Pap Claim

(#11), (Defs.' SMF ¶ 30), or the Medication Claim (#13), (*id*. ¶¶ 32–33).  Regarding the Bi-Pap

Claim, Plaintiff states that Defendants' position is "not exactly correct," (Pl.'s SMF ¶ 50),

because this issue was "informally [resolved]," (*id.* ¶ 54), through Plaintiff's argument to

Bentavegna and U.S. District Judge Kimba M. Wood, (*id*. ¶¶ 51–53).  Plaintiff contends that no

grievance was needed because there was "no relief which could have been obtained through the

facility grievance process."  (*Id*. ¶ 54.)  Regarding the Medication Claim (#13), Plaintiff similarly

argues that he "attempted to informally resolve this issue with B[entavegna]," and that this

"resulted in a favorable decision negating the need for formal administrative remedies."  (*Id*.

¶ 58.)  The Second Circuit has no rule "that a prisoner has exhausted his administrative remedies every time he receives his desired relief through informal channels."  *Ruggiero v. County of Orange*, 467 F.3d 170, 177–78 (2d Cir. 2006).  It has held the opposite: that Plaintiff must "grieve his mistreatment before filing suit despite the relief afforded" through informal channels.  *Id*. at 178.  This requirement "allows the prison to take corrective action, which may satisfy the prisoner and obviate the need for litigation; it might result in improvements to prison administration; and, for those cases that do find their way into the courts, it will facilitate adjudication by ensuring a fully—developed administrative record."  *Id*.  The Court separately disagrees with Plaintiff's claim that "no relief . . . could have been obtained through the facility grievance process."  (Pl.'s SMF ¶ 54.)  Although Plaintiff was satisfied to wait for his property, (*id.* ¶¶ 53–54), a grievance could have prompted Green Haven to develop "policies and procedures pertaining to the grievance," *Braham v. Clancy*, 425 F.3d 177, 183 (2d Cir. 2005) (citation omitted), *overruled on other grounds*, *Woodford*, 548 U.S. 81, such as causing the doctor who conducts sleep studies to visit more frequently, (*see* Pl.'s SMF ¶ 52).

No exception to the PLRA exhaustion requirement applies to these claims for which Plaintiff submitted no grievance.  *See Ross*, 136 S. Ct. at 1859–60.  Because there is no evidence that Plaintiff even attempted to file a grievance, the exception under *Williams*—for grievance processes that provide no guidance on what to do when a grievance is submitted but not filed— does not apply.  *See Grafton v. Hesse*, No. 15-CV-4790, 2017 WL 9487092, at *9 (E.D.N.Y. Aug. 25, 2017) (distinguishing *Williams* "because unlike the prisoner in *Williams* who attempted to file a grievance, [the plaintiff] made no effort to file any grievances regarding the claims at issue"), *report and recommendation adopted*, 2017 WL 4286266 (E.D.N.Y. Sept. 27, 2017), *aff'd*, 783 F. App'x 29 (2d Cir. 2019).  Nor were the grievance procedures so opaque writ large

that the regulatory scheme was incapable of use, as there was no apparent ambiguity regarding

the procedure for filing a grievance.  *See Whittington v. Ponte*, No. 16-CV-1152, 2020 WL

2750372, at *9 (S.D.N.Y. May 27, 2020) ("There is no dispute that the City 'provided grievance

procedures that inmates could utilize[]'—specifically, the three-step process outlined in 7

N.Y.C.R.R. § 701.5." (ellipsis omitted) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d

Cir. 2004))); *see also Hicks v. Adams*, 692 F. App'x 647, 648 (2d Cir. 2017) (summary order)

("[T]he grievance procedures here were not so opaque that the regulatory scheme was incapable

of use, as there was no ambiguity regarding what steps Hicks needed to take to file a proper

appeal.").  This is particularly true because Plaintiff has submitted numerous grievances in the

past.  (*See* Defs.' SMF ¶ 18; Pl.'s SMF ¶ 10.)  *See Whittington*, 2020 WL 2750372, at *9

(rejecting the plaintiff's theory that the grievance procedures "prevented him from filing

grievances in the first place" in part because the plaintiff "filed more than two dozen other

grievances," and gathering cases).[13]

---

[13] For the same reason the Court rejects Plaintiff's statement that he was "not able to
access [any] [p]aper, [p]en[s], or [e]nvelopes, much less any grievance forms," (Pl.'s Suppl.
SMF ¶ 4), as a basis for a finding that the grievance system was incapable of use.  In light of the
large number of grievances filed by Plaintiff, (*see* Defs.' SMF ¶ 18), no reasonable factfinder
could conclude that Plaintiff was generally incapable of using the grievance process.

For the same reason the Court rejects Plaintiff's argument that rounds of SHU were
required.  (Pl.'s Mem. 10.)  The IGP does state that "[a]n IGRC staff member . . . shall make
rounds of all special housing areas at a reasonable time at least once a week to allow inmates
direct access to the program."  (Stanaway Decl. and Exs. A & B 23.)  *See* 7 N.Y.C.R.R.
§ 701.7(c)(1).  As discussed, there is a factual dispute regarding whether an IGRC representative
made rounds in the infirmary.  *See supra*.  However, this provision is for the purpose of "giv[ing]
inmates who are having communication problems or difficulty writing their complaints an
opportunity to request and receive assistance."  (Stanaway Decl. and Exs. A & B 23.)  *See* 7
N.Y.C.R.R. § 701.7(c)(1).  Given the high volume of grievances filed by Plaintiff, (*see* Defs.'
SMF ¶ 18), no reasonable factfinder could conclude that Plaintiff fell into one of these two
categories and was incapable of using the grievance process due to the absence of rounds.

Finally, Plaintiff argues that there was no secure mailbox for grievances in the infirmary
where he was housed.  (Pl.'s Mem. 2, 10.)  Such a mailbox does not appear to be required under
the IGP.  (*See* Stanaway Decl. and Exs. A & B 23 ("*Where available*, SHU inmates shall use

The grievance process was not a dead end.  Courts have held that, to qualify for this exception, a plaintiff must "introduce facts to indicate that prison officials are 'consistently unwilling to provide any relief to aggrieved inmates.'"  *Jackson v. Downstate Corr. Facility*, No. 16-CV-267, 2018 WL 3650136, at *7 n.9 (S.D.N.Y. July 31, 2018) (alterations omitted) (quoting *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016)).[14]  The record before the Court does not suggest that prison officials ever provided

_____

centrally located IGP deposit boxes to send grievance forms and IGP correspondence to the IGP office." (emphasis added)).)  *See* 7 N.Y.C.R.R. § 701.7(b) (same).

[14] Several courts have implied that, for the dead end exception to apply, prison officials must be unable to provide relief. *See, e.g.*, *Muhammad v. Mayfield*, 933 F.3d 993, 1001 (8th Cir. 2019) (finding no dead end because the court "[could not] say [that] the [prison] [o]fficials lacked authority to provide some relief" (emphasis omitted)); *Richard v. LeClaire*, No. 15-CV-6, 2019 WL 5197041, at *8 (N.D.N.Y. May 6, 2019) (noting that a dead end existed where "a prison handbook directed inmates to submit grievances to a particular administrative office . . . [that] disclaimed the capacity to consider grievances" and holding that the plaintiff had not established "that he was *unable* to pursue grievances on his claims" (emphasis added)), *report and recommendation adopted*, 2019 WL 4233184 (N.D.N.Y. Sept. 6, 2019); *see also Green v. Schmelzle*, 239 F. Supp. 3d 669, 673 (W.D.N.Y. 2017) (finding a dead end where the plaintiff did not learn of alleged discrimination until "years" after it occurred, while "[t]he grievance regulations prohibit[ed], without exception, the filing of a grievance complaint more than 45 days after the alleged incident"). These cases appear to be inconsistent with *Ross*, which stated that an inmate faces a dead end "with officers unable *or consistently unwilling* to provide any relief to aggrieved inmates." 136 S. Ct. at 1859 (emphasis added). *Booth*, which the Eighth Circuit relies on to support its holding, *see Muhammad*, 933 F.3d at 1000, is not inconsistent with the statement in *Ross*, because *Booth* concerns the ability of prison officials to provide relief, not their willingness, *see generally* 532 U.S. 731; *see also id.* at 741 (holding that the plaintiff was required to exhaust administrative remedies even though they did not offer monetary damages, which he sought, because "Congress has mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures").

relief through the grievance process.[15][16]  That said, the evidence suggests that some of Plaintiff's

complaints were resolved informally.  (*See* Pl.'s SMF ¶¶ 50–54 (noting resolution of wheelchair

and Bi-Pap machine claims), 58 (noting resolution of medication claim through change in

distribution).)  These positive outcomes—even though they were not achieved through the

grievance process itself—contradict the view "that prison officials are 'consistently unwilling to

provide any relief to aggrieved inmates.'"  *Jackson*, 2018 WL 3650136, at *7 n.9 (citation and

ellipsis omitted); *see also Grafton v. Hesse*, 783 F. App'x 29, 31 (2d Cir. 2019) (finding, where

several prior grievances were noted "Grievance Accepted" that there was "no plausible basis for

determining" "that staff members were consistently unwilling to provide him with relief");

*Williams v. Sposato*, No. 13-CV-4247, 2019 WL 5310222, at *8 (E.D.N.Y. Oct. 21, 2019)

(holding that the grievance was not a dead end where record evidence indicated that the plaintiff

---

[15] The record contains at least eleven distinct grievances that were denied by the Superintendent for reasons other than failure to exhaust.  (*See* Pl.'s SMF Ex. 1 at 71; *id*. Ex. 2 at 66, 71, 72, 74–77 (Dkt. No. 333-2); Stanaway Decl. Exs. C & D 10, 30, 41.)  One of these grievances was rejected after the IGRC recommended granting the requested relief.  (Stanaway Decl. Exs. C & D 28, 30.)  Another was rejected after the IGRC split on the appropriate response.  (*Id*. at 8, 10.)  In addition, the record contains appeals that were denied by CORC of at least six distinct grievances.  (*See* Pl.'s SMF Ex. 2 at 67–69; Stanaway Decl. Exs. C & D 13, 31, 42.)  Again, this includes one grievance where the IGRC recommended granting relief.  (Stanaway Decl. Exs. C & D 28, 31.)  The Court is not aware of any grievances that were accepted.  While two CORC appeals are noted as "accepted in part," neither provides substantive relief or explicitly accepts any portion of Plaintiff's position.  (*See* Pl.'s SMF Ex. 2 at 67–68.)  And while Plaintiff alludes once to "winning a grievance," (Pl.'s SMF ¶ 93), the Parties provide no further detail, making it unclear whether this refers to a recommendation by IGRC—which the Superintendent may have subsequently rejected—or to a positive ruling by the Superintendent or CORC.

[16] The Court notes that the record may be incomplete, due to deficiencies in Defendants' briefing.  Plaintiff clearly argued that the grievance system is a dead end, "with prison officials constantly unwilling to provide any[] relief to aggrieved inmates."  (Pl.'s Mem. 22; *see also id.* at 22–23; Pl.'s SMF ¶¶ 107–10.)  Defendants do not respond to this argument.  (*See, e.g.*, Defs.' Reply 8–10 (describing IGRC rounds and rebutting Plaintiff's claim that his grievances were discarded, but not discussing the outcome of Plaintiff's grievances).)

"either received the relief he sought, or other appropriate relief which he accepted,

for . . . four . . . grievances").  That the relief apparently arose as part of the grievance process in

*Grafton* and *Williams* does not meaningfully distinguish these cases.  First, *Ross* refers to the

willingness of officers to provide relief generally, not through the grievance process specifically.

*Ross*, 136 S. Ct. at 1859.  And this makes sense, because correction staff willing to accommodate

informal requests would logically be willing to consider grievances fairly.  Second, the record

contains no evidence that Plaintiff decided to forego filing grievances because he thought the

process was a dead end.  *See Lapierre v. LaValley*, No. 15-CV-1499, 2019 WL 4015689, at *5

(N.D.N.Y. Aug. 26, 2019) (denying a dead end exception and granting a motion for summary

judgment because the plaintiff's prior filings "show[] that [he] did not view the filing of

grievances as a dead end" (citation omitted)), *report and recommendation adopted*, 2019 WL

4686415 (N.D.N.Y. Sept. 26, 2019), *aff'd*, 847 F. App'x 47 (2d Cir. 2021).  Indeed, Plaintiff

points to a variety of other reasons for not filing a grievance.  (*See* Pl.'s SMF ¶¶ 50–54 (informal

resolution), 58 (same), 89 (PREA complaints do not require grievances), 90 (lack of evidence),

95 (the *Heck* doctrine), 96 (the existence of a "policy or custom" theory); *see also id.* ¶ 49

(acknowledging failure to file grievances and consenting to dismissal).)

There is also no exception because correction officers thwarted Plaintiff's efforts to

submit grievances through machination, misrepresentation, or intimidation.  No evidence

suggests that "officials misled or threatened [Plaintiff] so as to prevent [his] use of otherwise

proper procedures."  *Ross*, 136 S. Ct. at 1860; *see also Medina v. Kaplan*, No. 16-CV-7223, 2018

WL 797330, at *5 (S.D.N.Y. Feb. 8, 2018) (finding that the plaintiff did not plead efforts to

thwart where she offered "[c]onclusory allegations of intimidation," and there was "no allegation

that the threat was even related to her grievance and ability to exhaust available administrative

relief"). Plaintiff argues that the grievance process was unavailable because prison officials routinely failed to file his grievances. (*See* Pl.'s Mem. 14–15; Pl.'s SMF ¶ 106.) But "Plaintiff offers no evidence that any particular officer thwarted his attempts to file his grievance[s] or appeal[s]," for example by "destroy[ing] his papers." *Davis*, 2019 WL 498277, at *9. Separately, the Court notes that Plaintiff did not file a grievance regarding the No Grievance Claims for reasons unrelated to the availability of the grievance process. *See supra* (describing Plaintiff's rationales—none of which concern lost mail or other possible machinations by corrections officers—for not filing grievances related to each No Grievance Claim). The PLRA seeks to encourage aggrieved inmates to file such grievances. *See Ruggiero*, 467 F.3d at 178 (noting that the PLRA meant to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case" (quoting *Porter*, 534 U.S. at 525)). It would be inconsistent with this rationale to find that no grievance procedure was available in instances where Plaintiff simply neglected to file or chose not to file a grievance.

Thus, the No Grievance Claims are dismissed. The Delay Claim (#4); the Discrimination Claim (#7); the Rookwood Force Claim (#15); the Rookwood/Hann False Report Claim (#20), with respect to Rookwood; the Supervisory Claim (#25), with respect to Effman and Maher; and the Ball Claim (#26) concern specific acts or omissions, which occurred years ago. The Bi-Pap Claim (#11) and the Medication Claim (#13) concern ongoing omissions, which were resolved. (*See* Pl.'s SMF ¶¶ 54 (Bi-Pap Claim (#11)), 58 (Medication Claim (#13)).) Because the 21-day window to file a grievance regarding these claims has passed, (*see* Stanaway Decl. and Exs. A & B 15); *see* 7 N.Y.C.R.R. § 701.5(a)(1), and "exhaustion was required but administrative remedies have become unavailable after the prisoner had ample opportunity to use them," *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004), these claims are dismissed with prejudice, *see id.* (finding

dismissal with prejudice is proper in such circumstances). Construing all facts in the light most favorable to Plaintiff, the Cushion Claim (#10) appears to concern ongoing omissions. Thus, this claim is dismissed without prejudice.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion For Summary Judgment is granted in part and denied in part.

The No Grievance Claims are dismissed. The Delay Claim (#4); the Discrimination Claim (#7); Bi-Pap Claim (#11); the Medication Claim (#13); the Rookwood Force Claim (#15); the Rookwood/Hann False Report Claim (#20), with respect to Rookwood; the Supervisory Claim (#25), with respect to Effman and Maher; and the Ball Claim (#26) are dismissed with prejudice. The Cushion Claim (#10) is dismissed without prejudice.

The Unserved Claims survive, subject to the requirement that Plaintiff must within 30 days request an extension of time to serve Griffiths, Anspach, and Hann, or his claims against these Unserved Defendants may be dismissed. These claims include the Griffiths/Anspach/Johanneman/Hann Assault Claim (#18), insofar as it relates to Griffiths, Anspach, and Hann; the Anspach False Report Claim (#19); the Rookwood/Hann False Report Claim (#20), insofar as it relates to Hann; and the Keeplock Claim (#21), insofar as it relates to Griffiths.

The No Motion Claims survive. These claims include the Howard Claim (#1); the Family Status Claim (#8); the Legal Call Claim (#9); the Wheelchair Pusher Claim (#12); the Rookwood Assault Claim (#16), insofar as it relates to alleged incidents in 2017; the Griffiths/Anspach/Johanneman/Hann Assault Claim (#18), insofar as it relates to Johanneman;

the Keeplock Claim (#21), insofar as it relates to Rookwood; and the Supervisory Claim (#25),

insofar as it relates to Griffin.

The Grievance Filed Claims survive.  These claims include the Gutwein Claim (#2); and

the Conditions Claim (#3), insofar as it relates to lack of recreation, hygiene products, and

contact with Plaintiff's mother (but excluding the claim that Plaintiff was denied a wheelchair).

The Grievance Unavailable Claims survive.  These claims include the Conditions Claim

(#3), insofar as it claims Plaintiff was denied a wheelchair; the Nunez/Pollen Verbal Abuse

Claim (#5); the Funk/Johanneman/Brock Verbal Abuse Claim (#6); the Bentavegna Force Claim

(#14); the Rookwood Assault Claim (#16), insofar as it relates to alleged incident in 2018; the

Nunez/Pollen Assault Claim (#17); the Confidential Info Claim (#22); and the Mail Tampering

Claim (#23).

The Court will hold a status conference on October 20, 2021 at 10:30am.  Defendants are

granted leave to request an evidentiary hearing with respect to Plaintiff's surviving claims.

The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt.

No. 328), mail a copy of this Opinion & Order to Plaintiff, terminate Effman, Maher, and Ball as

Parties, and update the docket as described in footnote 1 on page 2.

SO ORDERED.

DATED:      September 24, 2021
            White Plains, New York

            _____
            KENNETH M. KARAS
            UNITED STATES DISTRICT JUDGE